Today, Abyvazov v. Termogenov Abyvazov v. Termogenov Before this court are three petitions for review. The first petition for review seeks a review of the merits of the petitioner's initial asylum claim. The second petition seeks review of the Board of Immigration Appeals' denial of his first motion to reopen, which was submitted with new, previously unavailable evidence that was considered material. The third petition seeks review of the denial of a second motion to reopen that petitioner provided to the Board of Immigration Appeals. Petitioner submits that this court's review should be respectfully limited to the first and second petitions, the denial of the merits of the asylum case, and the denial of the first motion to reopen. With respect to the third petition, petitioner submits it is submitted to the extent that the Board's decision in that matter further advances his contention that the previously unavailable and material evidence submitted to the Board when first moving to reopen the case in the matter. Can we talk about the immigration judge's decision? Because the judge's decision seemed to be based heavily on the fact that Mr. Abyvazov failed to prove his ethnicity, failed to prove that he was what he said he was. Yes, Your Honor. Why was she incorrect in seeking either stronger proof or, when I gleaned from the record, an expert to say he is indeed a Roman? Your Honor, as to that question, I would submit that goes to the issue of the petitioner's credibility and that he was unable to establish it according to the immigration judge as a result through his testimonial. Credibility is always an issue. I apologize? Credibility is always an issue. It is indeed an issue, Your Honor, and we would submit that the immigration court's credibility and determination was not based on specific cognitive reasons, rather it was based on speculation and conjecture and personal opinion. From day one, it was all about an expert to the immigration judge. Time and again, the immigration court said, no expert, no ethnicity. But the same immigration judge gave him many, many chances to get this expert, right? And even begged him, quite frankly, to come in with an expert. She did, Your Honor, but the immigration judge's reasoning for requesting that expert is because of her previous decisions or previous issues with other cases related to Romas. If I could quote the immigration judge at page 79 to 82 of our appendix, the immigration judge goes into the fact that she's seen many Roma cases in the past. She's had people walk in with blue eyes saying that they were a Roma and bringing in a Nazi and UNAZI muffler scar, saying that bringing in this muffler scar and UNAZI scar and finding out later that the same individual admitted that his application was prepared by someone else in the Philadelphia community who was preparing these applications randomly. So using her predispositions, her previous cases or what has happened in other cases related to Romas, she's essentially made a predisposition on the respondent's case. On the other hand, Mr. LaHood, that's her experience. You can't take experience and leave it outside the door. So why couldn't she, based on her experience, say, look, I've had many cases like this. I need better proof. I need an expert to tell me you are what you say you are. With respect to the – If I could just add to that as well. I mean, you also have a person who says, I'm a member of the community, but I don't speak the language, which might send up a flag. Yes, right, which he, in turn, justifies at some point later on in that when he was growing up within that Roma community, he did speak some of the Roma language, although he wasn't taught by his family, the entirety of it, because he was living in Bulgaria. And as part of the Roma community out there, to further advance their cause, to further advance their ability to achieve better, they learned the language of the land. There were other tools available, of course, which was his brother, apparently, or his wife, that even though I understand that they may have been informed not to show up in court because they had their own problems, but that didn't prevent the submission of affidavits from both those people. But then again, Your Honor, as we had said in our brief, to fault the petitioner as to his wife's failure to submit an affidavit or his brother's failure to submit an affidavit would be inappropriate in all. If every little bit helps, why would it be inappropriate? To decide the case on his inability to secure an affidavit from another individual who just refused to give an affidavit simply just doesn't go to it. Or if it was a car accident and your brother and wife were there and they didn't decide to come to court that day. It's hard just to prove your case. Isn't that different? It's not that the case wasn't necessarily proven. If I may go back to this here, the judge, even before he began to testify, even before he submitted any evidence, even before he did anything from day one, it was only about an expert. And I would submit that even with the testimony of his wife or his brother, that the immigration judge would not have been content absent an expert testimony. I can't disagree with you. It did seem like the decision hinged on an expert. Yes, Your Honor. I can't, I mean, based on my look at the record. But that being the case, why, did you ask for, you weren't, I imagine, the attorney representing him before the evidence. I was not, Your Honor. We did, however, in a motion to reopen, move before the immigration, before the Board of Immigration Appeals. You couldn't, well, I'm not addressing the trial attorney, so it's a different thing. But based on your review of the record, why could you not get an expert? My review, based on my review of the record, is that the attorney, even though he had reached out to other individuals who may have provided testimony, he was unable to provide somebody who was qualified enough, had the expert knowledge, the experience and background as to whether he could, had the expert knowledge, experience and background to determine. Do you, do you, I found it a little bit unusual because to prove ethnicity, seems to me, doesn't really require an expert. I mean, ethnicity involves customs, habits, traditions, et cetera, et cetera, that you can testify yourself. I mean, the IJ could have said, what you've said is not sufficient, but is it the case that you need an expert to establish ethnicity? I would submit that that is not necessarily the case to establish, to establish ethnicity. If you look at the record of proceedings, Your Honor, you know, there's details within the respondent, the petitioner's affidavit, the petitioner's initial asylum application, the petitioner's credible fear interview when he first entered the United States, that shows that he does have the characteristics to establish the Roma ethnicity. But the immigration court, the immigration judge didn't care about anything. She just wanted an expert because in the past, she's had people come in and tell her that they were Roma, and it turned out that years later, they weren't Roma. And based on that predisposition, she ruled on the petitioner's case before he even began to testify, before she even looked at any of the records. There's, in this case, it's just a little more than just a question over his nationality. There are other reasons for the IJ's non-credibility determination. I mean, with respect to comparing the medical report and the photos and the testimony, that was another basis. And, you know, I mean, isn't that so? I mean, it wasn't just relying on his statement of his nationality, right? If I may, Your Honor, with respect to the perceived inconsistencies that the immigration judge found, we would respectfully submit that the inconsistencies, what she had deemed inconsistencies, were simply omissions. And she had deemed those omissions to be inconsistent with the record. You know, the medical report that you had referred to. It was the fractures, and he didn't testify that he had any broken bones, right? He did not testify that he had any broken bones. However, he did testify that the report that was prepared by that doctor was based on simple observations, not on scans, not on anything of the like. The report said he had many fractures. Was that the phrase? It just noted fracture. It noted fracture. I can't… Fractures. Fractures, yes. All right. No question that he's from Bulgaria. I apologize. No question that he was from Bulgaria? There's no question that he was from Bulgaria. Okay. Well, at one point the IJ says, I'm reading from page 112 of the appendix, my counsel is, as I stated, he submitted overwhelming evidence that Romans are targeted. Romans have a problem in Bulgaria and other parts of Europe. We're concentrated on Bulgaria, but not one iota of evidence that the respondent is, in fact, Roman. So at that point, had they presented evidence that he was Roman? Yes, Your Honor. It's his testimony, the previous affidavits. They had submitted a Euro-Roman membership card. They had submitted – there was evidence that was submitted, Your Honor. Notwithstanding that this judge was in the position there was no evidence presented? Yes, Your Honor, because of the judge's predisposition on what had happened previously with other cases dealing with Romans. It was basically Mr. Ivazov's testimony. His testimony, and there was also documentation that was submitted to the medical report, a police report. A Euro-Roman membership card. A Euro-Roman card? Yes. That's part of the – was there a photographer of it or something like that? He was named on there. She said that it was not authenticated? She said that it was not authenticated, Your Honor. If I could just go on to the issue of authentication just briefly here, and I think that this is something that – and I can understand that, Your Honor, the recognition of the government, the recognition with respect to authentication, the burden. First, as to the authentication on the Roman card, that was never objected to by the Department of Homeland Security as to that on authentication, if I recall correctly. Second, as to the authentication of the other documents, Your Honor, the immigration court, the government from the beginning of the case had – the government at the beginning of the case had discussed, and as we have discussed in our opening brief. Maybe I can interrupt you because adverse credibility finding is a little bit difficult to overturn. I – you know, we give a great deal of deference to the hearing official, as the I.J. in this case. So why were not the discrepancies that the I.J. outlined sufficient to support her adverse credibility finding? They weren't necessarily discrepancies, Your Honor. They were omissions, and an omission doesn't necessarily mean it's a discrepancy. You know, they weren't inconsistencies with what was written in there. Taken the record as a whole, however, there were other documents contained in there from his initial affidavit of entry, from his initial I-589 that he filed, from his initial credible fear interview that lent to his credibility. There was internal consistency, but what the I.J., what the immigration judge relied on, was an expert. The only thing that could prove this case to the immigration judge was an expert. Okay. We'll get you back on it. Thank you. Thank you, Mr. LaHood. Ms. Lee. Yes. Thank you, Your Honor. Can we pick up on that last point? Because there's something about what Mr. LaHood was saying in the argument of the petitioner in this case. It seemed like the entire decision hinged on one thing. Based on my review of the record, she made some credibility determinations, but it seemed like she was really focused on he didn't prove he was a Roma. And maybe you can address that because I don't know how to prove your ethnicity other than testifying to it. May I please? I mean, I need to cut you off, but maybe you can give me an instance where a court has sought expert testimony to prove ethnicity. May I please, Your Honor? Good morning. My name is Jenny Lee and I'm here on behalf of the respondent, the Attorney General of the United States. In this case, the immigration judge first asked the petitioner about his ethnicity in July of 2010. And when they had the marriage hearing, the immigration judge did not limit it solely to the expert witness report. Instead, she asked him about his brother that he came to the United States with. The immigration judge asked about his wife who was living in the United States. In addition, the... Well, let's say he didn't have a wife and he didn't have a brother. What relevance is it? Then he, well, he could have obtained information from other people from the Roma community. You mean to prove that you're a Roma? Yes. But as Judge Fuentes says, didn't they really fix, didn't this IG really fix on the fact that get an expert to prove this? Well, even though the immigration judge, it seems, based on what petitioner says that that's all she was focused on, she made two independent reasons. She had two independent reasons for finding petitioner for denying his asylum application. That's true, yes, but apart from that, it seemed like the focus was, in other words, what guided and colored her decision was he didn't prove he was a Roma. In fact, he adjourned the case several times to give him, say, an opportunity or required him, perhaps, to prove that he was what he said he was. Well, if you look at the immigration judge's decision, the lack of cooperation did not come solely from not having an expert witness report, but also from not having a statement from his brother living in the United States and his wife living in the United States. So it was not simply a cooperation claim decision based just on the expert witness report. There are at least ten references in the record where the IJ was asking about this expert. Where do we make that? She asked for it, but there were other ways he could have provided the information. We don't know what would have happened if he had provided an affidavit from his brother or from his wife. There is no question that Roma and persons of that ethnicity are persecuted in Bulgaria. Well, the immigration judge said that many would be granted asylum, but she didn't make a decision on his case. Right, right. She was worried, again, about... There were two independent reasons for denying it. Under the REAL ID Act, he has to be credible. He wasn't. And where it was reasonable for him to provide cooperation, and he was given numerous opportunities, he didn't. Because he missed his opportunity to bring in that cooperating evidence, he filed a motion to reopen with the expert witness report, which he claims was new and previously unavailable. However, simply because it wasn't available to him, that's not the standard. The standard is he has to show that the report could not have been discovered or presented at the former hearing. But the lawyer showed up and said, I've tried. Some people have died. I can't find anybody.  He did say that. It's not easy to find. Well, I found it very fascinating, very interesting. I don't know if fascinating is the right word for it. But I found it very interesting that when they filed the ineffective assistance to counsel claim, the former attorney provided his notes. So let's see what his attorney did. Starting in 2011, he spoke with his client and asked him to get a statement from a ROMA leader about his ethnicity. That same month, Petitioner said, I'm not able to produce a statement. In August of 2012, his attorney contacted Petitioner to ask him about an ethnicity witness. He asked his client to get letters from friends and family in Bulgaria and other ROMA organizations. And in September of 2012, Petitioner said that his friends and family cannot write letters because it has to be notarized. His brother cannot write a letter. And he doesn't want to contact ROMA organizations. There are obviously other ways to prove your ethnicity. I mean, would you agree with that? I mean, you could just testify yourself and say, I am of such an ethnic group. Yes, Your Honor. These are the customs, the traditions we follow, the dress we wear, the food we eat. These are our customs, and this is what I am. Yes, Your Honor, I completely agree. When I asked my 7-year-old son, I said, how would you say that, how would you prove to people that you're Korean? He said, based on my language, based on what I eat. Well, let's look at what Petitioner testified to. He said, my skin is a little darker, I wear torn clothes like torn sneakers, and I live in the ghetto portion of Bulgaria. Well, the population there was 45% ROMA and a population of 2,500 people. He was also an adherent of the Eurograma group? Yes, but he did not, again, he didn't authenticate his Eurograma card, which was his burden to do. Let me ask you about the Board of Immigration Appeals, their decision. Do you think it was adequate? Yes, Your Honor. Notwithstanding the fact that there was no reference to the wife's affidavit and no references at all in that letter with respect to the many references that I.J. made about the expert? So are you referring to the Board's second decision? Yeah, the dated March 3rd of 2015. That's the second decision, deny his first motion to reopen. Yes, it is adequate because that decision says that the Petitioner did not meet his heavy burden of establishing new evidence and that he could have presented this evidence before. He could have discovered or presented it at the former hearing. Now, Petitioner concedes in his second brief that the evidence that the expert used was previously available at the time of the prior hearing in front of the immigration judge. And common sense tells us that if he's credible, his ethnicity was the same too. So it makes no sense that he would be able to meet his heavy burden to show that this was new and previously unavailable. To go back to the very beginning of your argument, you said there were multiple bases for finding lack of credibility. Do you want to say something else? We've been focusing on the ROMA issue. Yes, Your Honor. Well, under the REAL ID Act, any inconsistency can be used to find an alien not credible. It doesn't have to go to the heart of his claim. Here we have material inconsistencies that go to the heart of his claim. He said that after he was first arrested, he was beaten such that his right wrist and his lower back was injured. And he made no mention of any fractures. But the medical letter said it was his left hand. There's a big difference between right and left. I mean, even a five-year-old knows that. And the medical letter says fractures. I know he said, well, they didn't take a scan of my body to know if I had fractures. Well, if you've ever had a broken bone, you would know you had a broken bone, not just a bruise. In addition, the medical letter mentioned nothing about the bath. So those are significant, specific, cogent reasons that the immigration judge used and the board affirmed. I think that there's no doubt that there are certain inconsistencies in the record, but I wonder how material they are. In light of the IJ's continued insistence on the immigrant proving his ethnicity, she was constantly asking him to prove that you are what you say you are. And during the case, numerous times, just for that purpose. And they were not able to do that, but they finally did. As you probably know, there's an expert report, which I have here in my hand. And they finally got somebody from England, a graduate of University of London, who specializes in this type of ethnic group and speaks the language. And had this been presented to the IJ during the course of the proceedings, is there any reason to doubt this would have been sufficient to prove that he is indeed Romani? Again, I don't know because at the time the immigration judge made two independent findings for denying his asylum application. But she continued, she adjourned the case, prove you're Romani and I'll give you a new name. He comes back and says, I got the proof. Wouldn't this be enough? We never got to that point in front of the immigration judge because he didn't bring it, he didn't bring any corroborating evidence. I understand. And he was not credible, Your Honor. But it seems to me that given her insistence that he prove that he is Romani and he comes back and does exactly that, notwithstanding the inconsistencies in the record, wouldn't this have been sufficient? It could have been, had it been produced in a timely manner. I guess we're speculating. But if it wasn't this judge, I mean, I don't want to say she was predisposed against Roma, but she was very skeptical of the claim. That's a fair reading of the transcript, right? She was very skeptical of the claim because it sounds like she had been misled on other Roma cases, right? That's a fair reading of the record. It looks like it. And that's why she was so adamant about getting an expert report. Well, I don't know if that's why she was so adamant about an expert report. It was Petitioner's Counsel that suggested maybe an expert witness might help when she was asking about his brother and his wife. So I do not believe that the immigration judge was so heavily predisposed. If Petitioner is making a due process argument, then he would have to show substantial prejudice. And I do not believe that he's able to overcome that substantial prejudice because there is the adverse credibility finding, which again is an independent reason for denying his asylum application. Because he was unable to get the expert witness report in front of the immigration judge after the board denied his first motion to reopen, he filed a second motion to reopen based on ineffective assistance of counsel. Oh, yeah, let's go back to that first. That's the one in which he sought to reopen in order to submit the expert report as well as the affidavits that the IJ had requested, which was denied? Yes, Your Honor. What was the rationale for denying that motion? Because it was not new and previously unavailable. I'm sorry, say again? Because it was not new and previously unavailable. It was not new, but it was new, wasn't it? It was new in the sense that he had had it before, but the implementing regulations to enact the motions to reopen portion, which comes from the Immigration Act of 1990, the congressional intent was to expedite the initiation and completion of judicial review. And that's why we have these motions to reopen reg, which requires that… That's ACFR Section 1003.2C1? Yes, Your Honor. And as the Supreme Court stated in Stone v. INS, which was a Supreme Court case from 1995, that it was congressional intent to expedite the initiation and completion of judicial review of these cases. We don't want an alien. We want these cases to be completed in a timely manner. And that's why we want an alien who is seeking asylum to bring all of his best evidence at the earliest stage possible. Here, Petitioner did not do that. Instead, he tried to string it along and file another motion to reopen, claiming ineffective assistance of counsel, which he failed to show due diligence in bringing it, an argument he waived before the court. In addition, he didn't show that his attorney was not reasonable in his trial strategy. And going back to… Can I ask you a question? This is kind of an interesting case in that we've all pointed out, and we all agree, that the immigration judge here has pretty much telegraphed, get us an expert report. Is this the kind of thing immigration judges ought to be doing? Do you advise parties, do this, do that? You know, it just seems a little unusual. I mean, we hear a right opinion. Maybe we're going to comment on that practice. Well, I was a trial attorney for five years in immigration courts for five years, and I don't know what to say. It is unusual in the sense that immigration judges should probably not be asking for certain types of evidence, but it does happen. Going back to what his attorney had done, after that hearing, the merits hearing of his asylum application, he contacted four different ROMA organizations and four different professors at various universities. And one of the professors said that he wasn't sure Petitioner was ROMA. And what did the other three say? The other three, well, I don't know, because Petitioner did not provide that as part of the log. And for those reasons, the respondent believes that all three petitions should be denied. There are no further questions. Thank you. Thank you, Ms. Lee. Mr. LaHood. I'm trying to figure out where to start after that, Your Honor. Start in the middle. Yes, I'm trying to here. First of all, Your Honor, I ask the Board of Immigration Appeals decision on the first motion to reopen. The government's counsel is completely incorrect that the Board of Immigration Appeals denied the first motion to reopen, not because of the issue of ROMA ethnicity, and that the affidavit of the expert proved that he was actually of ROMA ethnicity. They said it's completely irrelevant, because looking at the expert report, we make an independent determination that ROMAs in Bulgaria don't suffer persecution based on this report. That's what the denial of the Board of Immigration Appeals' denial on the first motion to reopen was based on that. Say that again, based on? Was based on that specific issue. They did go on to discuss it. It wasn't new. It wasn't, you know, it should have been previously available. What was the issue that it was decided on? It was decided on a read of the expert report. The Board of Immigration Appeals looked at that report and said, based on that report, we've determined, sui sponte, all right, we've determined, even though the immigration judge said, you know, we see a bunch of these cases, and, yeah, he could qualify for asylum. But based on that report, we make a determination that people of ROMA in Bulgaria aren't persecuted. But the whole purpose of that report was not to make a determination as to persecution. It's contrary to the country report, isn't it? I apologize. It's contrary to the country report. It's contrary to the country report. It's contrary to the immigration judge's decision in the underlying case. Are you referring to the March 3rd letter? Yes. In the language where she writes, the report does not show that ROMA generally face mistreatment? Yes. Right. That's what I was asking your opponent about earlier. So this letter makes no references to the IJA's repeated requests just to identify him as a ROMA. No, it doesn't. It says we don't even care. This case proves, this expert report proves that he's a ROMA, but we don't care. It doesn't matter. And it doesn't make any reference to the wife's affidavit, right? It makes no reference to the wife's affidavit whatsoever. And taking it a step further, the government's counsel says that, you know, the Board of Immigration Appeals found that his old counsel, his previous counsel, was indeed diligent in trying to secure expert testimony and the like, yet he was unable to do it. So doesn't that go to show that the expert report is new? It was unavailable at the time of the immigration court hearing. The Board of Immigration Appeals in its third decision specifically found that his prior counsel was effective, that he did all that he could to find an expert, and he couldn't find one. He was effective. So how is that? Thankfully, we were able to find one, but it wasn't there before.  It comes down to a judge that was predisposed, giving advice to counsels, giving advice to the petitioner, giving it, you know, essentially lawyering from the bench, which is not the job with all due respect of a jurist, Your Honor. Thank you. Mr. LaHood, thank you very much. Thank you. It was a pleasure. And, Ms. Lee, thank you. We'll take the case into consideration.